**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROBERT NOWICKI,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 2:18-cv-10900

DISTRICT JUDGE DENISE PAGE HOOD

MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 12 & 13)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 12), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **DENIED**, and this case be **REMANDED** for further consideration.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Robert Nowicki's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the

undersigned Magistrate Judge. (R. 3). Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 12, 13). Plaintiff has also filed a response. (R. 14).

Plaintiff filed his application for DIB on June 25, 2015, alleging onset on August 6, 2014. (R. 10 at PageID.52, 188-189). His claim was denied at the initial level on December 2, 2015. (*Id.* at PageID.120). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.71-100), Administrative Law Judge (ALJ) Virginia Herring issued a decision finding that Plaintiff had not been under a disability from his alleged onset date of August 6, 2014, through the date last insured, September 30, 2016. (*Id.* at PageID.49-70). The Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.30-36). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that

is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the

claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the amended alleged onset date of August 6, 2014, through the date last insured, September 30, 2016. (R. 10 at PageID.64). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.54). Next, the ALJ determined Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, status post fusion of the L4 to S1 with bilateral foraminal stenosis at L5 to S1 impinging the L5 nerve root; obesity; depression; and anxiety. (*Id.*). Additionally, he had as non-severe impairments fatty liver disease, asthma, and diabetes. (*Id.* at PageID.55). He did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.55-57). Before proceeding further, the ALJ found Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he

> could not push or pull, though he could occasionally use foot controls, climb stairs or ramps, balance, or stoop. He could not climb ladders, ropes, or scaffolds. He could not kneel, crouch, or crawl. He needed to use an assistive device for ambulation longer than 10 or 15 feet. He could not perform overhead work. He needed to avoid dangerous moving machinery and unprotected heights. He was limited to simple, routine tasks.

(*Id.* at PageID.57-58). At steps four and five, the ALJ concluded that Plaintiff was unable to perform any of his relevant past work, but that jobs he could perform existed in

significant numbers in the national economy—he could work, for example, as an assembler (36,000 jobs nationally); in sorting (7,500 jobs nationally), or in product processing such as polishing (18,000 jobs nationally). (*Id.* at PageID.63-64). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time. (*Id.* at PageID.64).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Plaintiff's Function Report

Plaintiff completed an adult function report with the help of his wife, Michelle Winchester Briney, on July 17, 2015. (Doc. 10 at PageID.249-256). Plaintiff was unable to do household chores or work "due to severe pain and numbness in [his] left extremity. (*Id.* at PageID.249). He also suffered from major depression, severe anxiety, and insomnia. (*Id.*). He explained: "I suffer from severe back pain and numbness in my left leg. I have suffered from severe anxiety and depression since childhood. I started receiving treatment for this in 1990. This year has been a nightmare with increased anxiety and depression. The back pain has been unbearable." (*Id.* at PageID.256).

On an average day, Plaintiff ate breakfast, watched the news or read, and might shower (depending on his pain level), and then rested until lunch. (*Id.* at PageID.250). After

lunch he would walk around the house. (*Id.*). He napped in the afternoon and "late evening," and had dinner with his family four to five times a week. (*Id.* at PageID.250, 253). Overall, his level of activity depended on how severe his anxiety was. (*Id.* at PageID.251). Plaintiff's wife took care of their pets. (*Id.* at PageID.250).

Previously, he had been able to exercise, "walk for any length of time," and sit comfortably. (*Id.*). He had difficulty sleeping due to severe pain and feeling "very nervous, full of anxiety, [and] extremely depressed." (*Id.*).

He needed help putting on shoes and socks, but was able to bathe, shave, care for his hair, feed himself, and use the toilet without issue. (*Id.*). Sometimes he was too depressed to bother with grooming. (*Id.* at PageID.251). He could no longer cook due to "[e]xtreme pain," so his wife prepared all the meals; he spent five minutes cleaning up after getting prepared food out of the refrigerator. (*Id.*). "[E]xtreme weakness and severe pain" prevented him from doing yard work like cutting the grass. (*Id.* at PageID.252).

Plaintiff went out once or twice a day; though he could drive "on very rare" occasions, usually his wife drove him. (*Id.*). His wife also did all the shopping and handled the finances. (*Id.*).

Though previously he had enjoyed taking day trips and exercising, he could no longer do either and had no interest "in recreational activities." (*Id.* at PageID.253). He read and watched television "as pain/anxiety permit[ted]." (*Id.*). Though he could go out alone, he was generally "uninterested in activities" and needed someone to accompany him to medical appointments. (*Id.*). At times he had difficulty getting along with others who did not understand his pain, anxiety, and depression. (*Id.* at PageID.254). He used to be

7

"very social," but "with the severe pain/anxiety depression [he] no longer enjoy[ed] company of any kind." (*Id.*).

Plaintiff indicated that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get alone with others, though he did not explain how. (*Id.*). By Plaintiff's estimate, he could walk 10 to 20 feet before needing to rest for a minute or two. (*Id.*). How long he could pay attention varied depending on his pain and anxiety. (*Id.*). He could follow both written and spoken instructions, but tended to get distracted. (*Id.*). Under stress, he would "often feel like I cannot take it anymore." (*Id.* at PageID.255). And changes in routine made him "very irritated." (*Id.*).

Plaintiff always used either a cane or a walker. (*Id.*). His medications caused side effects including sedation, slow reaction times, fatigue, sweating, shaking, and "daytime sleepiness." (*Id.* at PageID.256).

### ii. Third Party Function Report

Plaintiff's wife, Michelle Winchester Briney, also completed a function report dated July 17, 2015. (*Id.* at PageID.239-248). Like Plaintiff, she stated that he was in "constant pain and suffering from severe anxiety and depression." (*Id.* at PageID.239). On a usual day, she made breakfast while he read or watched the news, he would shower and then wait for lunch, and he would try to walk around the house. (*Id.* at PageID.240). He suffered from anxiety "during most of the day." (*Id.*). In the evening he read or watched television, "as symptoms permit[ted]." (*Id.* at PageID.241). Plaintiff had been attending physical therapy, but it had been placed on hold "due to worsening of symptoms." (*Id.*).

8

Plaintiff's wife took care of their pets, though previously Plaintiff had been able to get pet food and take the dog for a walk. (*Id.* at PageID.240). His sleep pattern was erratic; he was often awake during the night and needed sleeping medication. (*Id.*). She corroborated Plaintiff's report that he needed help putting on shoes and socks but could bathe himself, groom his hair, shave, feed himself, and use the toilet. (*Id.*).

Plaintiff used to cook several times a week, but his wife now prepared all the meals because he was unable to stand for long periods. (*Id.* at PageID.242). She also did all the shopping and handled their finances. (*Id.* at PageID.243). Since his back surgery, Plaintiff had been "unable to tolerate pain/numbness," making household chores "impossible"— though he did take about five minutes to clean the counter after getting his food. (*Id.* at PageID.242-243). Plaintiff went outside once a day, and though he could drive, it was painful, so he usually rode as a passenger. (*Id.*).

Again, Plaintiff's wife explained that Plaintiff used to enjoy exercising but had been unable to since 2012; he enjoyed reading or watching television "unless the pain of anxiety is too great." (*Id.* at PageID.244). Four to five times a week he had dinner with family, but he had not wanted to socialize outside of the house in the past year and he outright refused to attend family functions. (*Id.*). His wife wrote notes to remind him of appointments. (*Id.*).

His wife went on to describe his problems getting along with others: "He cries frequently and suffers from anxiety. He is often irritable with family (myself and children). In the last year, he has progressively worsened. He has become more and more unstable and depressed. He is extremely difficult to deal with. I have contemplated divorce." (*Id.* at PageID.245-246).

As Plaintiff had, she reported that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. (*Id.* at PageID.245). She estimated that he was able to walk 20 feet, slowly, before needing to rest for several minutes. (*Id.*). He used an assistive device every day: either his walker, on worse days, or a cane, on better days. (*Id.* at PageID.245-247). The length of his attention span depended on the severity of his pain and anxiety; he was easily distracted and frustrated. (*Id.* at PageID.245). Stress tended to make Plaintiff cry and "give[] up," while changes in routine made him irritable. (*Id.* at PageID.257). Plaintiff's wife had also noticed an increase in his fears about "diseases and worsening of condition." (*Id.*).

Additionally, Plaintiff's medications caused side effects: sedation, clouded thinking, and sleepiness. (*Id.* at PageID.248).

In summary, Plaintiff's wife said, Plaintiff had been

> on a steady decline in this past year. He is emotionally and mentally exhausted and suffers from major depression. Following the surgery, he had an increase in anxiety and depression. He is in constant pain and has numbness in his left lower extremity and is "unable to move" his leg as he once was able to. He cries frequently and is extremely irritable. He is no longer the man that the children and I used to know.

(*Id.*)

### iii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on December 19, 2016. (*Id.* at PageID.43-100). Plaintiff was 49 years old at the time. (*Id.* at PageID.78). He lived with his wife and her two children (24 years old and 17 years old), as well as a 17-year-old they

had taken in. (*Id.* at PageID.79). Although their house was two stories, Plaintiff remained on the first floor so he did not have to use the stairs, at night sleeping in a recliner that was "very uncomfortable." (*Id.* at PageID.80).

Plaintiff suffered from pain in his lower back that also shot down both legs. (*Id.* at PageID.87). He had had a two-stage surgery including fusion from L4 to S1 and "cage fusion," but his pain had not improved. (*Id.* at PageID.80-81, 87). Initially, as he recovered from the surgery, the pain "was disguised with pain medication," but now Plaintiff refused to take narcotics[1] because he had "too much of an addictive personality" and felt there were "other ways of doing this." (*Id.* at PageID.87). As for his "foot drop," he testified that it "was very slight to begin with" and had not gotten any better or worse. (*Id.* at PageID.81-82).

Plaintiff had a high school education and had attended some college. (*Id.* at PageID.82). He had his driver's license, but did not drive because his medications slowed his reaction time. (*Id.*). In 2011 or 2012, he had worked for his own business (which was in his wife's name) taking care of his father, who had end stage vascular dementia. (*Id.* at PageID.82-83). Around 2009 and 2010, he had done the same work but under a different company name. (*Id.* at PageID.84). From 2008 to 2009, he had worked part time as a registered nurse with a nursing agency called Solvis Medical. (*Id.*). And from August 2007 to January 2008, he had worked as an RN for a nursing home, Medilodge, as well as at

---

[1] He also testified, however, that he occasionally took Tramadol for "extreme pain." (*Id.* at PageID.87).

Crittenton Hospital and Sponsicor. (*Id.*). In addition, from 1989 to 1999, he had worked as a paramedic. (*Id.* at PageID.86).

As an RN, he had regularly lifted patients who weighed anywhere between 150 and 400 pounds, working in a team and sometimes using a lift. (*Id.* at PageID.85). At times he had needed to personally lift more than 100 pounds. (*Id.* at PageID.85-86). Now he was no longer able to work because he could no longer lift as much weight, his head was "foggy all the time," and he lacked "the skill set that [he] used to have"—"I just don't have it together," he explained. (*Id.* at PageID.86). In his prior jobs as a nurse, he often had to deal with both sick people and well people. (*Id.*). Now he had "a very short temper" and did not deal with people well because he was constantly in pain. (*Id.* at PageID.86-87).

His pain was aggravated by bending, sitting for too long, or standing for too long. (*Id.* at PageID.88). After about twenty minutes, he needed to "rotate" or "move in some way for a fashion." (*Id.* at PageID.88). He could lift about five pounds. (*Id.*).

From July 12 to August 4, 2016, Plaintiff had attended "detox" at Sacred Heart because he was taking his sleep medications "indiscriminately"—he "didn't like being awake because [he] was in pain." (*Id.* at PageID.88-89). But "it was going to lead to a divorce and worse problems, and [he] wanted [his] life to be free of that." (*Id.* at PageID.89). He still took sleep medication because otherwise he would be unable to sleep at night, but his wife controlled his medications. (*Id.* at PageID.89). (As an aside, Plaintiff explained that his wife had become his caregiver, had "really had to step it up," and "kind of resent[ed him]." (*Id.* at PageID.89)).

The ALJ observed that Plaintiff was using a walker; without it, he could walk about 10 to 15 feet, possibly needing to hold onto things. (*Id.* at PageID.89-90). The walker was "a little bit for balance, and mostly more recently back pain." (*Id.* at PageID.90). He used it at home as well, though he sometimes used a cane. (*Id.*). Days on which he did not need it were "[f]ew and far in-between." (*Id.*).

Around the house, he made his lunch and then "just [tried] not to be a pain in the neck." (*Id.* at PageID.91). On an average day, he got up around 11 in the morning or noon and had coffee, took his medications, and tried to get comfortable. (*Id.* at PageID.91). He showered about twice a week, using a shower chair. (*Id.* at PageID.92). Because raising his arm above his shoulder sparked pain in his lower back and legs, his wife had to "help [him] get completely dressed." (*Id.* at PageID.92). He spent a lot of time watching television. (*Id.* at PageID.91).

Plaintiff's wife did the grocery shopping, the laundry—"everything." (*Id.* at PageID.92-93). He did not accompany her on errands. (*Id.* at PageID.93). He did not have any family nearby or any friends. (*Id.* at PageID.93). While he had previously been "an avid reader," now he could not get through "a couple paragraphs" without losing concentration. (*Id.* at PageID.93).

As for his medications, Plaintiff was "on a maxed dose of antidepressants" plus anti-anxiety medications. (*Id.*). Side effects included difficulty focusing and remembering, which frustrated him to the point of causing crying spells two or three times a week. (*Id.* at PageID.93-94).

### iv.  The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Michael Rosko also testified at the hearing. (*Id.* at PageID.95-99). He classified Plaintiff's past work as a registered nurse as skilled work with an SVP of 7, classified as medium and performed at "at least medium if not heavy to very heavy." (*Id.* at PageID.95-96). The ALJ then posed a hypothetical:

> [A]ssume a hypothetical individual with the same age, education and work experience as our claimant . . . . [who] can work at the sedentary level with the following limitations. No pushing and pulling. . . . [O]ccasional[] use of foot controls because he can drive. . . . He can occasionally climb stairs and ramps but never ladders, ropes or scaffolds; can occasionally balance and stoop but not kneel, crouch or crawl.
>
> Needs an assistive device for ambulation that's more than 10 to 15 feet; cannot perform any work overhead; must avoid dangerous moving machinery, unprotected heights; and is limited to simple and routine tasks due to distractions from medication, et cetera.

(*Id.* at PageID.96).

The hypothetical person could not perform Plaintiff's past work, according to the VE, but could work as an assembler (2,500 jobs in Michigan, 36,000 nationally); in sorting jobs (400 in Michigan, 7,500 nationally); or in product processing jobs (700 jobs in Michigan, 36,000 nationally); as well as in document scanning jobs (no numbers provided). (*Id.* at PageID.97). In the VE's experience, employers in this type of work would tolerate at most two absences per month on an ongoing basis. (*Id.* at PageID.98). Workers needed to remain on task at least 90 percent of the time, aside from scheduled breaks, which comprised two 10- or 15-minute breaks and one lunch period of 30 to 45 minutes. (*Id.*).

Lastly, the VE confirmed that his testimony had been consistent with the Dictionary of Occupational Titles, except that his testimony about time off task, absences, and standard work breaks was outside the scope of the DOT. (*Id.* at PageID.98-99).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. [2] The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §

---

[2] As Plaintiff's claim was filed before March 27, 2017, he continues to receive the benefit of the "treating source rule" found in § 404.1527. For claims filed on or after that date, the rules in § 404.1520c apply instead. 20 C.F.R. § 404.1527.

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.

2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to any subsequent reviewers the weight
> the adjudicator gave to the treating source's opinion and the reasons for that
> weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242.

For example, an ALJ may properly reject a treating source opinion if it lacks

supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp.

637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th

Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays

the groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he [or she] furnishes such medical and other evidence of the existence

thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S.

at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the

claimant's statements with the other record evidence, considering his or her testimony

about pain or other symptoms with the rest of the relevant evidence in the record and factors

outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).

This analysis and the conclusions drawn from it—formerly termed a credibility

determination[3]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

### G. Analysis

Plaintiff attacks the ALJ's opinion from several directions, arguing that the ALJ erred by: failing to give enough weight to his treating therapist, giving too much weight to the state agency consultant, discounting his GAF score, not obtaining an updated medical opinion on equivalence, failing to properly address his subjective complaints, omitting a sit-stand option from his RFC, cherry-picking evidence, and failing to carry the Commissioner's burden at Step Five. (R. 12).[4] I address each in turn.

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

[4] Plaintiff also makes a point of citing 42 U.S.C. § 421(h) for the proposition that the Commissioner is required "to utilize the standard Psychiatric Review Technique Form when initially reviewing the application and on reconsideration. The form should be considered at the administrative hearing level by a medical consultant or the Administrative Law Judge based on medical information in the administrative record." (R. 12 at PageID.1080). But he never actually argues that the Commissioner failed to do so here.

And regardless, in actuality, § 421(h) does not specify the use of any particular form, but merely declaims: "An initial determination . . . shall not be made until the Commissioner of Social Security has made every reasonable effort to ensure—(1) in any case in which there is evidence which indicates the existence of a mental impairment, that a qualified psychiatrist or psychologist has completed the medical portion of the case

## 1. The Opinion of the State Agency Consultant

To begin, Plaintiff faults the ALJ for giving great weight to a state agency psychologist "who merely reviewed the claimant's records once, prior to December 2015, but did not treat or evaluate the Claimant over a period of time and who also did not have the ability to review subsequently submitted medical records." (Doc. 12 at PageID.1080.) It is true that "*[g]enerally,* we give more weight to medical opinions from . . . treating sources . . . ." 20 C.F.R. § 404.1527(d)(2) (emphasis added). But the Social Security Administration has recognized that "[i]n appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). *See also Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015) ("Generally, an ALJ is permitted to rely on [a] state agency physician's opinions to the same extent as she may rely on opinions from other sources."); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency to accord greater weight to state agency physicians over [the claimant's] treating sources was not, by itself, reversible error."). Here, the ALJ assigned great weight to the opinion of state agency consultant Bruce Douglass, who found Plaintiff able to perform routine, two-step tasks on a sustained basis, because it was consistent with the record "as a whole"—specifically, "the claimant's mental health progress notes documented the claimant was generally alert and oriented, attentive[,] and displayed intact memory upon

---

review and any applicable residual functional capacity assessment . . . ." Agency consultant Bruce G. Douglass, Ph.D., served that function in this case. (R. 10 at PageID.109-110).

mental status examination." (*Id.* at PageID.62) (citing *id.* at PageID.692, 694, 696, 698, 700, 706). The ALJ's decision to assign great weight to the state agency consultant was not error merely because the consultant "did not treat or evaluate the Claimant over a period of time."

Additionally, Plaintiff cites at some length from 20 C.F.R. § 404.1527, which lists factors for an ALJ to consider when weighing medical opinions, but an argument that the ALJ disobeyed the mandates of 20 C.F.R. § 404. 1527 fails to coalesce. Plaintiff does not identify any factors the ALJ failed to consider (though the ALJ is not required to provide an "exhaustive factor-by-factor analysis," *Francis v. Comm'r Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011)) or explain how consideration of those factors could have changed the outcome of the analysis. Instead, Plaintiff complains again that "the Court adopted the opinions of one-time Consultation Examiners and/or agency doctors, despite the Administrative Record contradicting records [sic] from the Plaintiff's treating doctors for both physical and mental health issues." (R. 12 at PageID.1084). I address this argument elsewhere, and suggest that Plaintiff has waived any allegation of error related to the § 404.1527 factors: "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

For the above reasons, I suggest that the ALJ properly analyzed Douglass's opinion.

### 2.  Plaintiff's Alleged "Episodes of Decompensation"

Additionally, Plaintiff accuses the ALJ of "improperly characteriz[ing] the difference between episodes of decompensation and psychiatric hospitalizations in her opinion" and "immediately disregard[ing] the issue of decompensation merely due to the specific hospital stay." (R. 12 at PageID.1080-1081). It is not entirely clear how Plaintiff envisages this definitional disagreement affecting the outcome of his case—he cites, specifically, to the ALJ's decision to assign little weight to Dr. Peter Trent Smith in part because his opinion about Plaintiff's episodes of decompensation contradicted the record. (R. 10 at PageID.62). To the extent Plaintiff seeks to challenge the ALJ's rationale for giving little weight to Dr. Smith, I suggest his argument is unavailing. (R. 12 at PageID.1080.)

The ALJ explained that she assigned Dr. Smith's opinion little weight because "it is vastly inconsistent with the medical evidence of record." (R. 10 at PageID.62.) In particular, the ALJ was troubled that Dr. Smith had reported that Plaintiff had had three or more episodes of decompensation within 12 months, each at least two weeks long, (R. 10 at PageID.62), but the record shows three hospitalizations less than two weeks long, (*id.* at PageID.62) (referring to *id.* at PageID.810-827, 890-919, 1007-1070). The ALJ seems unaware, however—as does Plaintiff—that the hospitalizations in the record all came *after* Dr. Smith penned his opinion. In other words, Dr. Smith could not have been referring to the hospitalizations in the record. This oversight does not work to Plaintiff's advantage; it only heightens the disconnect between Dr. Smith's opinion and the record evidence.

Further, Dr. Smith's report of multiple episodes of decompensation amounts to a single checked box, (R. 10 at PageID.808), and Plaintiff does not allege or point to any evidence that he experienced periods of decompensation before Dr. Smith wrote his opinion. *Cf. Hernandez v. Commissioner of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) ("Even if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [medical source statement] here is 'weak evidence at best' and meets our patently deficient standard." (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010))).

But perhaps by drawing the Court's attention to his "episodes of decompensation," Plaintiff simply intends to argue that the ALJ should have analyzed his hospitalizations in more detail. The term "episodes of decompensation," upon which Plaintiff focuses, was formerly one of the four functional areas an ALJ considered in determining whether a claimant met the "paragraph B" criteria of a listing at step three. 20 C.F.R. § 404.1520a(c)(3). (eff. June 13, 2011 to Jan. 16, 2017).

When the ALJ here issued her opinion on April 27, 2017, however, the areas in which she needed to rate Plaintiff's limitations no longer included episodes of decompensation, and instead numbered: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3) (eff. Mar. 27, 2017); Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 2016 WL 5341732, *66138 at n. 1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.")

22

This change does not, however, render Plaintiff's hospitalizations irrelevant. And this discussion cannot help but draw the Court's attention to the paucity of the ALJ's Step Three analysis. I recognize that a critique of the ALJ's Step Three analysis is nowhere to be found among Plaintiff's scattershot arguments. But the rule that an ALJ must "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"—it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis. *Reynolds v. Commissioner of Social Security*, 424 F. App'x 411, 416 (6th Cir. 2011). Because the requirement is prudential, a plaintiff cannot waive this argument by not raising it. *Id.*

In Plaintiff's case, the ALJ considered listings 12.04 and 12.06, either of which may be satisfied by either B or C criteria in addition to the A criteria.[5] 20 C.F.R. § 404, Subpt. P, App'x 1, 12.00(G)(1) Paragraph C requires a claimant have a "serious and persistent" mental disorder, meaning a medically documented history of the disorder over at least 2 years. *Id.* at 12.00(A)(2)(c). In addition, it requires evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting that is ongoing and diminishes the symptoms and signs of the mental disorder, *and* (2) marginal adjustment—minimal capacity to adapt to changes in environment or to demands that are not already part of the claimant's daily life. *Id.* at 12.04, 12.06.

---

[5] The ALJ did not discuss paragraph A at Step Three—the medical criteria in each listing—but she did find both his depression and anxiety to be severe impairments and later recognized that "[t]he record documents a longstanding history of depression since the claimant was 22 years old." (R. 10 at PageID.54, 61).

After laying out the C criteria, the ALJ dispatches with them in a single sentence: "[T]he record fails to document the existence of any of these criteria." (R. 10 at PageID.57). This bald statement cannot be reconciled with the record—or even the ALJ's own opinion, which goes on to discuss "[m]ental health progress notes by Peter Trent Smith, M.D., dated August 2013 through February 2016" and to acknowledge that "[t]he record documents a longstanding history of depression since the claimant was 22 years old," some 30 years ago. (*Id.* at PageID.61, 63). Further, nowhere in Step Three does the ALJ acknowledge the Plaintiff's three psychiatric hospitalizations within three months in 2016, which seem the type of evidence that evinces the "marginal adjustment" required by Paragraph C.

In April 2016, Plaintiff was admitted to Harbor Oaks for eight days "after having had significant symptoms of depression along with anxiety," "responding poorly" to the prospect of an imminent divorce. (*Id.* at PageID.810-827). The next month, in May 2016. He had had "fleeting suicidal thoughts for a few days" and had taken about 50 tablets of Ativan in six days. (*Id.* at PageID.890). On June 17, 2016, Plaintiff was admitted to Havenwyck Hospital for twelve days after his wife found him preparing to hang himself in the garage; he reported that he had suicidal thoughts just prior to admission and "has been feeling that his life is not worth living." (*Id.* at PageID.1007-1008, 1011). Undated notes from his hospitalization show that he at first "remain[ed] quite depressed" and had thoughts of suicide, then improved slowly with continued suicidal thoughts, and remained depressed and anxious for several notes before finally his mood stabilized and he denied any suicidal thoughts. (*Id.* at PageID.1008-1009). Additionally, in July 2016, he was admitted to Sacred Heart Rehabilitation for detoxification. (*Id.* at PageID.858).

24

The ALJ's stark statement that there is *no* evidence of paragraph C criteria leaves no room for interpretation; I suggest that substantial evidence does not support the ALJ's findings at Step Three, and remand is appropriate. Though on remand the ALJ may ultimately find again that Plaintiff does not meet or medically equal a listing, there is some evidence that suggests Plaintiff may meet or equal a listing, and it is the ALJ's duty to grapple with that evidence.

Related is Plaintiff's concern that evidence continued to accrue after the state agency consultant's examination of the record, SSR 96-6p requires an updated medical opinion when: (1) "in the opinion of the [ALJ] or the Appeals Council," record evidence suggests a judgment of equivalence "may be reasonable"; or (2) additional medical evidence is received that, "in the opinion of the [ALJ] or the Appeals Council," may change the state agency consultant's finding on equivalence. SSR 96-6p (S.S.A.), 1996 WL 374180, at *3-4.

The Court reasons: "There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing is issued." *Kelly ex rel. Hollowell v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Thus, "[a]bsent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Id.*; *see Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 723 (6th Cir. 2012) ("Claimant thus must demonstrate either that the [new evidence] suggest[s] that she qualified as mentally retarded under [the listing] or that the ALJ believed the [evidence] may have changed the experts' findings.").

Plaintiff is correct that a portion of the medical record did not exist at the time the state agency consultant completed his review, including multiple appointments at the Forum Medical Clinic (R. 10 at PageID.38, 41, 45, 46, 47, 931, 934, 939, 946, 948)[6]; Dr. Peter Trent Smith's Mental Impairment Questionnaire (*id.* at PageID.805); hospital visits for "shortness of breath" (*id.* at PageID.855), for wax blockage in his ear (*id.* at PageID.922), and for what appeared to be benzodiazepine withdrawal (*id.* at PageID.852); two appointments with a gastrointestinal specialist (*id.* at PageID.830, 833); a stay at Sacred Heart Rehabilitation Center, Inc., for detoxification (*id.* at PageID.858); at least one visit to the Michigan Head & Spine Institute (*id.* at PageID.1004); his four-day psychiatric hospitalization (*id.* at PageID.890); his eight-day psychiatric hospitalization (*id.* at

---

[6] Several of these appointments, however, were after the ALJ rendered her decision, *e.g.*, (R. 10 at PageID.38, 41), and thus are not for the Court to consider. Where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, the Sixth Circuit has held that the record is closed at the administrative law judge level and district court review of the administrative record is limited to the ALJ's decision. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

And although Plaintiff repeatedly closes sections of his brief with a request that the Court remand his case "under both sentence four and sentence six" of 42 U.S.C. § 405(g), he never actually argues that any of this is "new" evidence in the context of Sentence Six. (R. 12 at PageID.1074, 1081, 1082, 1085). Sentence Six provides for remand where the claimant presents (1) evidence that "is both 'new' and 'material,'" and (2) "good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Plaintiff does not engage with this standard at all—he has not claimed this evidence is "new" as defined for the purposes of Sentence Six, let alone new *and* material, or made any attempt to present "good cause," and so I see no grounds for a Sentence Six remand.

PageID.810); and his twelve-day psychiatric hospitalization (*id.* at PageID.1007). Plaintiff fails to allege that the ALJ believed the evidence may have changed the state agency consultant's opinion on equivalence, or that the new evidence is suggestive of listing equivalency. But for the reasons explained above, the ALJ should reconsider whether this evidence is suggestive of listing equivalency, in which case an updated medical opinion would be warranted under SSR 96-6p.

Once a court determines that the Commissioner's administrative decisions are not supported by substantial evidence, the court faces a choice: either remand the case to the Commissioner for further proceedings, or direct the Commissioner to award benefits. The court may do the latter "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits," in a case "where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Serv.*, 17 F.3d 171, 176 (6th Cir. 1994). This is not such a case. Here, the ambiguous medical evidence compels me to suggest the Court remand the case to the Commissioner for further analysis as appropriate.

### 3.   Plaintiff's GAF Score

Plaintiff asserts that the ALJ "completely discounted" his GAF score "because it did not support her finding of not disabled." (R. 12 at PageID.1080.) But the ALJ acknowledged that the record contained GAF scores ranging from 40 to 68, (R. 10 at PageID.62) (citing *id.* at PageID.805, 859), and that a GAF score is a "medical opinion" that must be considered with the rest of the relevant evidence, (*id.*) She noted, however, that "GAF scores are of limited use in assessing the severity of a mental impairment for

several reasons," including that they "do not provide a reliable longitudinal picture of the claimant's mental functioning," "do not predict prognosis or treatment outcomes," and do not "directly correlate to the severity requirements in [the Administration's] mental disorders listings." (*Id.*). Thus, she gave them little weight. (*Id.* at PageID.805, 859).[7]

The Commissioner has repeatedly "declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). And the Sixth Circuit has emphasized that no "statutory, regulatory, or other authority require[s] the ALJ to put stock in a GAF score in the first place." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). I see no evidence that the ALJ here in fact discounted Plaintiff's GAF score merely "because it did not support her finding"; rather, she simply acknowledged the limited usefulness of GAF scores—which the Sixth Circuit and Commissioner have recognized before.

### 4. Plaintiff's Subjective Complaints of Pain

Next, Plaintiff avers that the ALJ "failed to properly analyze the pain issue" in compliance with SSR 96-7p. (R. 12 at PageID.1082.) An ALJ must consider the claimant's

---

[7] Plaintiff's GAF score of 40 was assigned by Dr. Smith in his Mental Health Questionnaire completed in February 2016. (R. 10 at PageID.805). The only other GAF scores in the record were from his time at Sacred Heart Rehabilitation Center in July through August 2016, where a staff member recorded his "Admit GAF" as 41 and "Current GAF" as 68. (R. 10 at PageID.859). The score was not assigned by an acceptable source, however, but by a Licensed Master Social Worker and Certified Advanced Alcohol and Drug Counselor. (*Id.*). *See* SSR 06-03p (S.S.A.), 2006 WL 2329939, at *2 (rescinded eff. Mar. 27, 2017).

statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, *see Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987), and generally cannot be disturbed absent a "compelling reason," *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1

(July 2, 1996). Instead, the absence of objective evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). But the ALJ "is not required to discuss every factor or conduct a factor-by-factor analysis." *Pratt v. Comm'r of Soc. Sec.*, No. 1:12-cv-01084, 2014 WL 1577525, at *3 (W.D. Mich. Apr. 21, 2014) (collecting Sixth Circuit authority), *adopted by* 2014 WL 1577525 (Apr. 21, 2014).

Here, the ALJ discussed Plaintiff's daily activities, (R. 10 at PageID.58), Plaintiff's self-reported pain and tingling, (*id.* at PageID.58-59), and the side effect of fatigue caused by his medications, (*id.* at PageID.58), as well as use of a walker, (*id.* at PageID.59), and his treatments, including two spinal surgeries, (*id.* at PageID.59).

Plaintiff makes much of the note in state agency consultant Douglass's evaluation that his "[m]edication sedates him and causes him fatigue." (*Id.* at PageID.115). But in the very next sentence, Douglass concluded that Plaintiff's "[a]ttention and concentration are adequate for routine tasks." (*Id.*).

Thus, I suggest that the ALJ properly analyzed Plaintiff's subjective complaints, and that Plaintiff has failed to present a "compelling reason" to disturb the ALJ's credibility assessment.

### 5. Need for Additional Limitations in RFC

Further, Plaintiff alleges the ALJ erred by not including in his RFC the use of a walker or a sit/stand option. (R. 12 at PageID.1082.) He states generally that his "medical records, aggressive treatment which included numerous back surgeries, and his testimony support the need for these limitations," though he does not point to any specific parts of the record. (*Id.*).[8]

As an initial matter, the ALJ *did* include in his RFC that he needed to use an assistive device for ambulation longer than 10 or 15 feet, (R. 10 at PageID.57-58); Plaintiff himself testified at the hearing that without his walker, he could walk about 10 to 15 feet, (*id.* at PageID.89-90).

As for the sit-stand option, Plaintiff did testify—somewhat ambiguously—that after about 20 minutes of sitting or standing, he needed to "rotate" or "move in some way for a fashion." (*Id.* at PageID.88). But the ALJ need not include limitations that she did not find credible. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779-80 (6th Cir. 1987). And Plaintiff does not challenge the ALJ's finding that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely

---

[8] Plaintiff's brief is hardly pellucid on this point, but he appears to suggest that the ALJ's failure to include those limitations was due to improperly evaluating his subjective complaints of pain. (R. 12 at PageID.1082.) That contention is discussed in further detail above.

consistent with the medical evidence and other evidence in the record." (R. 10 at PageID.59). Nor does he identify any other evidence in the record that suggests he requires a sit-stand option. Thus, I suggest the ALJ did not err by failing to include a sit-stand option in Plaintiff's RFC.

### 6. The Commissioner's Step Five Analysis

Plaintiff also asserts that the Commissioner "failed to meet its burden of proof in step #5," but fails to explain further in either his brief or reply. (R. 12 at PageID.1084; R. 14 at PageID.1109). Nor is any defect readily apparent from the record, as the ALJ relied on the VE's testimony that a hypothetical person with the earlier-mentioned RFC could work in a number of positions, including as an assembler (36,000 positions nationally); sorter (7,5000 positions nationally); or product processing (18,000 positions nationally). (R. 10 at PageID.64). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Thus, I suggest that Plaintiff has waived this argument.

### 7. Cherry-Picking

Lastly, Plaintiff states in his opening brief: "The Commissioner was also required to consider records in their entirety, not to pick and choose from findings and opinions which supported a finding of not disabled while blatantly ignoring findings and opinions in the same reports/records which suggest that the Plaintiff was disabled." (R. 12 at

PageID.1080). In his reply, again, Plaintiff alleges the ALJ "improperly evaluated by picking and choosing from findings and opinions which supported a finding of not disabled while blatantly ignoring findings and opinions in the same reports/records which suggested that the Plaintiff was disabled." (R. 14 at PageID.1106). Yet Plaintiff offers no example of this "blatant" cherry-picking; nor did any leap out at this reader. Thus, I suggest that Plaintiff has waived this argument as well—*see Stewart*, 628 F.3d at 256—and that even had he not, it would fail. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."); *see also Delong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (An allegation of "'cherry picking' the record . . . is seldom successful because crediting it would require the court to re-weigh record evidence.").

### H. Conclusion

For the reasons stated above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 12), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **DENIED**, and this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 27, 2019                    S/ Patricia T. Morris
                                         Patricia T. Morris
                                         United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 27, 2019                    By <u>s/Kristen Castaneda</u>
                                        Case Manager